1  SCOTT + SCOTT LLP
   Arthur L. Shingler III (181719)
2  Nicholas J. Licato (228402)
   600 B Street, Suite 1500
3  San Diego, CA  92101
   Tel.: 619/233-4565
4  Fax: 619/233-0508
   Email: ashingler@scott-scott.com
5
   SCOTT + SCOTT LLP
6  David R. Scott
   108 Norwich Avenue
7  P. O Box 192
   Colchester, CT  06415
8  Tel:  860/537-5537
   Fax: 860/537-4432
9  Email: drscott@scott-scott.com

10  *Counsel for Plaintiff*

11

12              **UNITED STATES DISTRICT COURT**

13         **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

14

15

16  DONALD SMITH, on Behalf of          )
    Himself and All Others Similarly     )  Case No.
17  Situated,                            )
                                         )
18              Plaintiff,               )  **CLASS ACTION COMPLAINT**
                                         )  **FOR VIOLATIONS OF THE**
19         vs.                           )  **FEDERAL SECURITIES LAWS**
                                         )
20  BIGBAND NETWORKS, INC.,              )
    AMIR BASSAN-ESKENAZI, AND            )
21  FREDERICK A. BALL,                   )  JURY TRIAL DEMANDED
                                         )
22              Defendants.              )
                                         )
23

24

25

26

27

28



1    Plaintiff, individually and on behalf of all other persons similarly situated, by
2  plaintiff's undersigned attorneys, for plaintiff's complaint against defendants, alleges
3  the following based upon personal knowledge as to plaintiff and plaintiff's own acts,
4  and upon information and belief as to all other matters, based on, inter alia, the
5  investigation conducted by and through plaintiff's attorneys, which included, amongst
6  other things, a review of the Defendants' press releases, Securities and Exchange
7  Commission ("SEC") filings by BigBand Networks Inc. ("BigBand Networks" or the
8  "Company") and its related entities (collectively "Defendants"), as well as media
9  reports about the Defendants.  Plaintiff believes that substantial evidentiary support
10  will exist for the allegations set forth herein after a reasonable opportunity for
11  discovery.

12                         **SUMMARY AND OVERVIEW**

13    1.    This is a securities class action on behalf of all purchasers of the publicly
14  traded securities of BigBand Networks Inc. ("BigBand Networks" or the "Company")
15  between March 20, 2007 and September 27, 2007 (the "Class Period") against
16  BigBand Networks and certain of its officers and directors for violations of the
17  Securities Exchange Act of 1934 (the "1934 Act").

18    2.    BigBand Networks Inc. develops, markets, and sells network-based
19  platforms that enable cable operators and telephone companies to offer video, voice,
20  and data services across coaxial, fiber, and copper networks. Its product applications
21  enable service providers to deliver high-quality video, voice, and data services, as well
22  as offer video advertising.

23    3.    During the Class Period, Defendants made false and misleading
24  statements regarding the Company's business prospects, financial results and forward
25  guidance. From a time prior to the Company's IPO on March 20, 2007, Defendants
26  made false and misleading statements regarding its readiness to supply the market
27  with fully developed and robust technologies and products. However, Defendants'
28  false and misleading statements served to conceal the fact that the Company faced

1  serious difficulties with the deployment of its switched digital video ("SDV")
2  technology, as well as the viability of its cable modem termination ("CMTS")
3  business.

4        4.      Specifically, despite Company product claims of mature product
5  applications for its quadrature amplitude modulation ("QAM") format products, used
6  to encode and transmit digital cable channels via cable, which could be deployed
7  seamlessly onto existing infrastructure, in cost-effective scaled installations that met
8  new needs for media processing and video networking throughout an operator's
9  network, Defendants knew and concealed that: (a) the Company faced increasingly
10 complex customer requirements that required significant customization efforts and/or
11 product refinements; (b) the Company faced difficulties in its attempts to implement
12 and customize its switched digital video ("SDV") technology; (c) the viability of the
13 Company's cable modem termination system ("CMTS") was in doubt; and (d) the
14 Company lacked an objectively reasonable basis to make its business projections and
15 forward guidance during the Class Period.

16        5.      As a result of defendants' false statements, BigBand Networks stock
17 traded at artificially inflated prices during the Class Period, reaching a high of $21.43
18 per share on May 3, 2007.

19        6.      Then, on August 2, 2007, the Company issued a disturbing press release
20 which detailed lackluster second quarter results. As a result, shares of the Company's
21 stock tumbled $3.88 per share, for a loss of over 28 percent, to close on August 3,
22 2007 at $10.10 per share.

23        7.      Then, on September 9, 2007, the Company conceded that, while the
24 Company had potential as a developer and marketer of its software applications,
25 products and services, the Company was still not ready to effectively market its
26 various products and it would be some time before shareholders would know if the
27 $13 per share paid during the March 2007 IPO could be justified.

28

8.    Following this, on September 27, 2007, the Company revealed the true dimensions of its product development woes, particularly the fact that efforts to deliver mature, market-ready products were frustrated by the very customer technologies and hardware that the BigBand products were purportedly designed to work with. The Company's product development woes appeared to be at the root of the Company's disastrous financial performance, knocking as much as $23 million off the revenue guidance for the third quarter. On this news, shares of BigBand Networks stock fell nearly $2.67 or 29 percent, on volume of 6.8 million shares, to close on September 28, 2007 at $6.40 per share.

## JURISDICTION AND VENUE

9.    Jurisdiction is conferred by §27 of the 1934 Act. The claims asserted herein arise under §§10(b) and 20(a) of the 1934 Act and Rule 10b-5.

10.    Venue is proper in this District pursuant to §27 of the 1934 Act. New City Financial maintains its corporate offices in this District and many of the false and misleading statements were made in or issued from this District.

## THE PARTIES

11.    Plaintiff Donald Smith purchased BigBand Networks publicly traded securities as described in the attached certification and was damaged thereby.

12.    Defendant BigBand Networks Inc. develops, markets, and sells network-based platforms that enable cable operators and telephone companies to offer video, voice, and data services across coaxial, fiber, and copper networks. BigBand Networks' principal business offices are located at 475 Broadway, Redwood City, CA 94063.

13.    Defendant Amir Bassan-Eskenazi ("Eskenazi") was, during the relevant period, the CEO and President of BigBand Networks. Defendant Eskenazi assisted in the preparation of the false financial statements and repeated the contents therein to the market.

1    14.    Defendant Frederick A. Ball ("Ball") was, during the relevant period,

2 CFO, Principal Accounting Officer and Senior VP of BigBand Networks. Defendant

3 Ball assisted in the preparation of the false financial statements and repeated the

4 contents therein to the market.

5    15.    Defendants Eskenazi and Ball are referred to herein as the "Individual

6 Defendants."    The Individual Defendants, because of their positions with the

7 Company, possessed the power and authority to control the contents of BigBand

8 Networks' quarterly reports, press releases and presentations to securities analysts,

9 money and portfolio managers and institutional investors, *i.e.*, the market.    Each

10 individual defendant was provided with copies of the Company's reports and press

11 releases alleged herein to be misleading prior to or shortly after their issuance and had

12 the ability and opportunity to prevent their issuance or cause them to be corrected.

13 Because of their positions and access to material non-public information available to

14 them but not to the public, each of these defendants knew that the adverse facts

15 specified herein had not been disclosed to and were being concealed from the public

16 and that the positive representations which were being made were then materially

17 false and misleading.    The Individual Defendants are liable for the false statements

18 pleaded herein, as those statements were each "group-published" information, the

19 result of the collective actions of the Individual Defendants.

20                                    **SCIENTER**

21    16.    In addition to the above-described involvement, each Individual

22 Defendant had knowledge of BigBand Networks' problems and was motivated to

23 conceal such problems.    Defendant Eskenazi, as CEO, and Ball, as CFO, were

24 responsible for financial reporting and communications with the market. Many of the

25 internal reports showing BigBand Networks' forecasted and actual growth were

26 prepared by the finance department under their direction. Each Individual Defendant

27 sought to demonstrate that he could lead the Company successfully and generate the

28 growth expected by the market.

1    **FRAUDULENT SCHEME AND COURSE OF BUSINESS**

2    17.    Each defendant is liable for (i) making false statements, *or* (ii) failing to

3 disclose adverse facts known to him about BigBand Networks.    Defendants'

4 fraudulent scheme and course of business that operated as a fraud or deceit on

5 purchasers of BigBand Networks common stock was a success, as it (i) deceived the

6 investing public regarding BigBand Networks' prospects and business; (ii) artificially

7 inflated the prices of BigBand Networks' common stock; and (iii) caused Plaintiff and

8 other members of the Class to purchase BigBand Networks common stock at inflated

9 prices.

10    **DEFENDANTS' FALSE AND MISLEADING**
**STATEMENTS ISSUED DURING THE CLASS PERIOD**

11

12    18.    On March 20, 2007, the Company filed SEC Form 8-K, indicating that

BigBand had closed the initial public offering, selling a total of 12.3 million shares,

13
for net proceeds of $90.6 million. The filing made reference to the Company's

14
registration statement, on SEC Form S-1, which stated in part:

15
The BigBand Solution

16
        We develop, market and sell network-based platforms that enable

17 service providers to offer video, voice and data services across coaxial,
fiber and copper networks. Our software and hardware product

18 applications are used to offer video, voice and data services
commercially to tens of millions of subscribers, 24 hours a day, seven

19 days a week and have been successfully deployed by leading service
providers worldwide including six of the ten largest service providers in

20 the United States.

21        We combine rich media processing, modular software and high-
speed switching and routing with carrier-class hardware configurations

22 into product applications designed to address specific service provider
needs. Our product applications enable service providers to deliver high-

23 quality video, voice and data services and offer more effective video
advertising. Our key product applications include Digital Simulcast,

24 TelcoTV, Switched Broadcast, and High-Speed Data and Voice-over-IP.

25        Our solution offers the following key benefits:

26        •    Intelligent Bandwidth Management.    Using our product
applications, service providers can address their increasing bandwidth

27 needs. For example, we offer what we believe to be the only switched
broadcast application commercially deployed today. Our Switched

28 Broadcast product application only transmits channels to subscribers

when the subscribers in a service group are in the process of watching those channels, instead of broadcasting all channels to all subscribers all the time. This enables service providers to achieve up to 50% savings in bandwidth usage for digital subscribers, allowing service providers to offer additional services without altering the subscriber viewing experience. One of our customers that had used all of its available bandwidth capacity for existing channel programming was able to use our Switched Broadcast product application to add new, higher revenue HDTV channels without dropping existing channels.

• High-Quality Video Experience.  Our product applications allow service providers to minimize the likelihood of video quality errors by detecting potential video quality degradation in real-time and correcting such degradation before the video stream is delivered to subscribers. Our core suite of video processing software modules are designed to enhance the richness of the viewing experience by optimizing the delivery of video streams, while our program level redundancy functionality adds the switching capability to automatically provision an alternative video stream should the quality of the primary stream begin to degrade.

• Enhanced Video Personalization.  Using our product applications, service providers interact with their subscribers down to the individual channel change and, as a result, can more accurately tailor programming packages to the interests of their subscribers. For example, our Switched Broadcast product application enables service providers to satisfy consumer demand for increasingly personalized content by expanding the number of channels that can be offered because selected channels are only delivered when the channel is requested by a subscriber in the service group. Using this application, one of our customers was able to offer additional channel packages tailored to demographic groups.

• Ability to Deliver Relevant Video Advertising.  Our product applications allow service providers to insert advertising tailored to specific subscriber groups. For example, using our Digital Simulcast application, service providers can simultaneously insert different ads into multiple copies of the same program and forward them to specific geographic zones. This allows service providers to attract advertisers interested in reaching niche markets.

• Optimize Return on Existing Infrastructure Investment.  Our network-based product applications allow service providers to manage service quality from the network, rather than deploying costly personnel and equipment at the customer premises. Because our product applications are deployed at the network level, service providers can leverage their infrastructure investment across many subscribers and avoid the hardware and service costs associated with an upgrade of equipment in the homes of subscribers. For example, using our M-CMTS architecture, service providers will be able to quadruple the existing downstream capacity of our High-Speed Data product application without the need to replace CPE. The need for higher speeds is increasingly required for the delivery of video over the Internet.

• Platform Flexibility. Our product applications feature a fully programmable hardware and modular software architecture. Our field-upgradable hardware is designed to meet service provider platform flexibility requirements and to minimize the need to replace existing hardware. For example, one customer initially purchased our equipment for basic media processing functionality and was subsequently able to further enhance this same hardware platform within a matter of hours to deliver our advanced Digital Simulcast product application simply by licensing an additional software application from us.

Our objective is to be the leading provider of network-based products that enable the delivery of high-bandwidth, high-quality video, voice and data services and more effective video advertising. Key elements of our strategy include the following:

• Further Technology Leadership Position. Over the past eight years, we have developed differentiated media processing and video systems design expertise. We used our media processing expertise to deliver what we believe to be the only switched broadcast product commercially deployed today. We are also building upon our IP networking and media processing expertise to develop the first M-CMTS solution. We will continue leveraging our expertise to deliver products that focus on optimizing network infrastructure and enabling delivery of a high-quality user experience.

• Leverage Modular Architecture to Accelerate New Product Introduction. We have created a series of media processing software modules that, when combined with our programmable hardware and switching fabric, serve as the foundation for a range of network-based product applications. The competition between cable operators and telephone companies is accelerating the rate of change in their networks, and we believe our software modules will serve as the foundation for rapidly delivering solutions that address our customers' bandwidth and service delivery needs.

• Expand Footprint Within Existing Customer Base. We are intensely customer focused. We have customer relationships with a number of service providers both in the United States and internationally, including six of the ten largest service providers in the United States. *We believe these customer relationships give us a strong advantage in understanding our customers' network challenges and delivering timely solutions, as we did with our Switched Broadcast product application. We will continue to work closely with our customers on the designs of their network architectures and emerging services, expand our relationships with these customers to deploy more of our existing applications, and develop and deliver new applications to address their network challenges.*

• Expand Customer Base Regardless of Access Technology. Service providers deploy video, voice and data services to subscribers across networks based on coaxial, fiber and copper. We have successfully deployed our product applications across these access technologies. We are currently providing Verizon with a solution that allows both digital and analog transmission of video over fiber-optic lines. Other telephone companies deploying video services over existing

DSL lines leverage our media processing expertise to provide such video services. Still others use our product applications to carry services over coaxial cable. We intend to leverage our media processing expertise to penetrate new customers worldwide, regardless of the type of access networks they use.

• Broaden Addressable Advertising Capabilities.    We currently enable service providers to insert video advertisements targeted to subscribers in specific geographic zones. We intend to collaborate with our customers to continue developing and deploying next-generation advertising solutions and are currently in field trials with a leading cable operator for the delivery of ads tailored down to the individual subscriber level.

• Leverage Video Over IP Expertise.    We believe that service providers will seek to offer live and on-demand video services to an increasing array of IP-capable devices, such as TVs, personal computers, mobile phones and portable devices, as well as attempt to integrate video, VoIP and data into new services. This will create a need for platforms that integrate video processing and IP networking. Since inception, our development efforts have focused on combining networking with real-time processing of video. Our M-CMTS architecture is the first step in our plan to meet the market demand for video over IP by enabling cable operators to more cost effectively offer bandwidth to IP-enabled devices. We intend to further leverage our video expertise to provide a broader array of solutions to cable operators as they scale their video-enhanced triple-play services directed at PCs and other IP-capable devices.

Product Applications

We deliver product applications that provide rich media processing and high-speed switching and routing, which enable service providers to offer advanced video, voice and data services to subscribers and advertisers. Our product applications are a combination of our video or data hardware platforms and key software modules that run inside our carrier-class hardware platforms and deliver the application-specific functions.

Video

We combine our carrier-class hardware platforms and modular media processing software to deliver the following product applications:

Digital Simulcast.    We were first to implement what we believe has become the industry's de facto network architecture for digital simulcast. Historically, video content was broadcast only in analog form. Analog video presents a number of limitations to service providers, including deterioration of video quality, higher cost to insert relevant advertising in the video stream, and the cost of converting analog to digital for certain digital devices in the home, such as digital video recorders.

Our Digital Simulcast product application enables service providers to create a digital version of analog inputs and deliver both

1  analog and digital video streams to subscribers. This gives service
   providers a cost-efficient way of migrating subscribers from analog to
2  digital video, which uses lower cost all-digital set-top boxes, while still
   supporting a large installed base of analog set-top boxes and televisions.
3  In addition, using our Digital Simulcast product application, service
   providers can overcome the video quality limitations inherent in the
4  transport of analog over long distances and the low-quality conversion
   from analog to digital in consumer digital devices. They also can reduce
5  their investment in costly equipment used to transport analog signals and
   achieve operational efficiency by using a converged digital network.
6  Finally, our Digital Simulcast application allows service providers to
   insert advertisements into the digital video stream and deliver those ads
7  either in digital or analog form to subscribers. This offers our customers
   incremental revenue opportunities through the ability to insert
8  advertisements into the digital stream targeted to specific geographic
   zones.

9

10       We deliver our Digital Simulcast product application by
   combining our Broadband Multimedia-Service Router hardware
11 platform, which we refer to as our BMR, with our core media processing
   modules with advanced splicing capability.

12       TelcoTV.   Telephone companies use our BMR to provide a very
   high-quality viewing experience, while still benefiting from the use of
13 digital video transport throughout their networks. We enable telephone
   companies to leverage their existing Synchronous Optical Network, or
14 SONET, infrastructure, which was originally designed for voice
   communications, to transport video content throughout the network. This
15 provides significant cost savings as telephone companies are not required
   to build a dedicated video transport network. They deploy our video
16 application in network locations called video serving offices, or VSOs,
   that provide service directly to consumers. This product application
17 leverages the same key technologies that were previously deployed in
   many of the largest cable operator networks in the world. Our TelcoTV
18 product application integrates our core media processing modules with
   our BMR with built-in radio frequency, or RF, modulation, analog
19 decoding and local content insertion. Our platforms have been
   engineered to comply with the Level-3 Network Equipment Building
20 System standard, or NEBS, which is a set of telecommunications
   industry safety and environmental design guidelines for equipment in
21 central offices.

22       Switched Broadcast.   We believe we were the first company to
   develop and commercially deploy a switched broadcast application.
23 Traditionally, service providers broadcast all channels to all subscribers
   at all times. Our Switched Broadcast application enables service
24 providers to transmit video channels to subscribers only when the
   subscribers in a smaller subset of subscribers within a network, called a
25 service group, are in the process of watching those channels. Depending
   on the number of subscribers and the amount of duplicate channels
26 within a service group, our Switched Broadcast product application
   typically allows service providers to achieve up to 50% bandwidth
27 savings in the delivery of digital video content and use the reclaimed
   bandwidth to offer additional content. This reclaimed bandwidth can be
28 used to deliver niche video packages, more HDTV channels, high-speed

data service and/or voice service. Service providers often use our Switched Broadcast product application as a means to free up the bandwidth to implement digital simulcast. The diagram below illustrates how bandwidth can be reclaimed using our Switched Broadcast product application, which broadcasts only those channels that are being watched within a service group.

In addition, our Switched Broadcast product application gives our service providers real-time access to the actual viewing habits of their subscriber groups, information that is increasingly valuable as they and their advertisers seek to tailor advertising or personalized channel services to specific subscriber groups and individual subscribers.

We deliver our Switched Broadcast product application by combining our core media processing modules with our BMR, Switched Broadcast Session Server and Broadband Multimedia-Service Edge hardware platform, which we refer to as our BME.

*Data*

High-Speed Data and Voice-over-IP.    Our High-Speed Data product application enables cable operators to offer real-time services, such as VoIP and streaming video content over the Internet. Using our High-Speed Data product application, cable operators can offer different levels of data speeds, which can be tiered based on the level of subscriber fees or on real-time bandwidth needs. Our High-Speed Data product application offers redundancy characteristics and a distributed switch fabric with routing and forwarding capabilities across multiple application modules, instead of in a central core where switching latency can be exacerbated. As a result, those cable operators that are deploying voice services can leverage the ability of our High-Speed Data product application to reduce dropped packets and latency to deliver high-quality and reliable voice services.

*Modular CMTS is the next generation of our High-Speed Data product application, which is currently in multiple customer trials on three continents. Customers using our existing CMTS product will be able to cost-effectively upgrade to our M-CMTS platform. This will allow them to quadruple their downstream delivery capacity without additional CMTS equipment or next-generation cable modems. We accomplish this by combining a software upgrade with an external edge quadrature amplitude modulation, or QAM, modulator for downstream traffic, freeing up processing capacity in our CMTS to process more downstream traffic on the same hardware. We expect to begin commercial deployment of our M-CMTS product in the first half of 2007.*

\*\*\*

19.    Defendants' statements as contained in the Registration Statement referenced in the March 20, 2007 8-K were false and misleading. The Company described its product development oriented relationships with existing customers,

1  which it exploited to develop and "deliver timely solutions," in the form of
2  commercial software and hardware product applications, used to offer video, voice
3  and data services. Nevertheless, the Company's commercial products were hardly
4  that, since Bigband faced *growing product implementation woes,* the direct result of
5  serious product commercialization issues that, if known at the time, potentially would
6  have derailed the Company's financing efforts.

7      20.    These commercialization problems included (i) attempts to deploy
8  immature product applications, which would face significant customer acceptance
9  delays as a result of intensive "customization" requirements and (ii) the related
10 inability to keep pace with software development demands, as defined by the latest
11 technologies, hardware and solutions already deployed and required by BigBand
12 customers.

13     21.    On March 20, 2007, as part of the Company's initial public offering,
14 Company insiders, including Defendants, sold shares of BigBand stock according to
15 the following schedule:

| Insider[1] | BASSAN-ESKENAZI | OZ | GILBERT | ISRAELY | TOTALS |
|---|---|---|---|---|---|
| **Shares** | 400,058 | 400,000 | 20,109 | 446,229 | 1,266,396 |
| **Proceeds** | $5,200,754 | $5,200,000 | $261,417 | $5,800,977 | $16,463,148 |

21     22.    As a result of defendants' false statements, BigBand Networks stock
22 traded at artificially inflated prices during the Class Period, reaching a high of $21.43
23 per share on May 3, 2007.

[1]    In addition to Defendant Eskenazi, insiders who sold shares of Bigband stock as a result of
26 the Company's IPO financing efforts include (i) Ran Oz, the Company's co-founder and Chief
Technology Officer; (ii) Dean Gilbert, a Director of BigBand; and (iii) Gal Isrealy, a Director of
27 BigBand, who is associated with Cedar Funds, which beneficially owned 4.4% of BigBand
immediately following the IPO.

1    **THE TRUTH UNFOLDS**

2    23.    On August 2, 2007, BigBand Networks issued a press release entitled,

3    "BigBand Networks Reports 2nd Quarter 2007 Financial Results." The release stated

4    in part:

5    BigBand Networks, Revenues increased 43% year over year

6    Net revenues of $54.5 million

7    On a GAAP basis,

8    Gross margin of 53.4%;

9    Operating income of $42,000; and

10    Net income of $1.7 million, or $0.02 per diluted share.

11    On a non-GAAP basis (excluding certain non-cash charges --
stock-based compensation and amortization of intangibles -- net of tax),

12

13    Gross margin of 54.2%;

Operating income of $3.1 million, or 6%; and

14
Net income of $4.7 million, or $0.07 per diluted share.

15
REDWOOD CITY, Calif., Aug 2, 2007—BigBand Networks,

16    Inc., (NASDAQ: BBND), a leading provider of broadband multimedia
infrastructure for video, voice and data, today announced financial

17    results for the three and six months ended June 30, 2007.

18    For the second quarter of 2007, BigBand Networks reported net
revenues of $54.5 million, an increase of 43% over the second quarter of

19    2006. GAAP net income for the quarter was $1.7 million, or $0.02 per
diluted share, compared to a net loss of $0.6 million, or ($0.05) per share

20    reported in the second quarter of 2006. Gross margin improved to 53.4%
on a GAAP basis from a gross margin of 48.7% in the second quarter of

21    2006. Operating income increased to $42,000 on a GAAP basis during
the second quarter of 2007 from an operating loss of $0.4 million in the

22    second quarter of 2006. GAAP results for the second quarter of 2007
includes $2.9 million in stock-based compensation expense and $0.1

23    million in amortization of intangibles. In the second quarter of 2006, we
incurred $0.5 million in stock-based compensation expense, $0.1 million

24    in amortization of intangibles and $57,000 in preferred stock warrant
expense. A reconciliation of our GAAP and non-GAAP results is

25    included as part of this release.

26    Excluding the above-mentioned charges, net of tax, non-GAAP
results for the second quarter of 2007 includes net income of $4.7

27    million, or $0.07 per diluted share, compared to a net loss of $22,000, or
$0.00 per diluted share, reported in the second quarter of 2006. Gross

28    margin improved to 54.2% during the second quarter of 2007 from

48.9% in the second quarter of 2006. Operating income increased to $3.1 million during the second quarter of 2007 from $0.3 million in the second quarter of 2006.

"We are pleased with our improvements in both revenues and earnings results in the second quarter," commented Amir Bassan-Eskenazi, president and CEO of BigBand Networks. "We continued to drive significant expansion of the footprint of our media services platforms. We continue to work closely with customers in supporting their efforts to enhance their existing networks for advanced video services. We believe that BigBand's solutions for switched broadcast and TelcoTV will continue to gain traction with major customers both in the U.S. and internationally.

For the first six months of 2007, BigBand Networks reported net revenues of $107.3 million, an increase of 52% over the first half of 2006. GAAP results for the six months period of 2007 includes net income of $0.7 million, or $0.01 per diluted share, compared to a net loss of $1.6 million, or ($0.15) per diluted share reported in the six months period of 2006. Gross margin improved to 55.4% in the first half of 2007 from 49.8% in the first half of 2006. Operating income increased to $3.4 million during the first half of 2007 from an operating loss of $1.5 million in the first half of 2006. GAAP net income for the first half of 2007 includes non-cash charges of $5.0 million in preferred stock warrant expense, $5.4 million in stock-based compensation expense, and $0.3 million in amortization of intangibles. This compares to non-cash charges of $0.2 million in preferred stock warrant expense, $0.8 million in stock-based compensation expense and $0.3 million in amortization of intangibles for the first half of 2006.

Excluding the above-mentioned charges, net of tax, non-GAAP results include net income for the first half of 2007 of $10.5 million, or $0.16 per diluted share. This compares to a net loss of $0.7 million, or ($0.06) per diluted share, reported in the first half of 2006. Gross margin improved to 56.1% during the first half of 2007 from a gross margin of 50.0% in the first half of 2006. Operating income increased to $9.0 million during the first half of 2007 from an operating loss of $0.4 million in the first half of 2006.

"Video continues to be a major driver of capital expenditures in service provider networks. We believe that our technology innovation and time-to-market leadership are key competitive differentiators in our video and data markets. Our product roadmap calls for more innovation as the industry moves to addressable advertising and personalized video services. We continue to be well-positioned for additional growth over the long-term and are optimistic about our business," concluded Bassan-Eskenazi.

Business Outlook

Based on current expectations, management provided the following outlook for its business in the third quarter of 2007:

Quarter Ending September 30, 2007

Net revenues are anticipated to be in the range of approximately $54 to $58 million.

GAAP gross margins are anticipated to be in the range of 53% to 55%, which includes approximately $0.4 million in stock-based compensation.

GAAP operating expenses are anticipated to be in the range of $30 to $31 million, which includes approximately $3.0 million in stock-based compensation and amortization of intangibles.

Provision for income tax is anticipated to be in the range of approximately $0.5 to $0.6 million.

Fully diluted weighted average shares are anticipated to be in the range of 71 to 72 million shares.

This equates to GAAP earnings (loss) per share in the range of ($0.01) to $0.03, and a non-GAAP earnings per share in the range of $0.03 to $0.07.

Fiscal Year Ending December 31, 2007

Net revenues are anticipated to be in the range of approximately $225 to $230 million.

GAAP gross margins are anticipated to be in the range of 54% to 56%, which includes approximately $1.5 million in stock-based compensation.

GAAP operating expenses are anticipated to be in the range of $116 to $121 million, which includes stock-based compensation of approximately $10.5 million and amortization of intangibles of $0.6 million.

Provision for income tax is anticipated to be in the range of approximately $2.0 to $2.5 million.

Fully diluted weighted average shares are anticipated to be in the range of 69 to 70 million shares.

This equates to GAAP earnings per share in the range of $0.03 to $0.08, and a non-GAAP earnings per share in the range of $0.28 to $0.33.

\*\*\*

24.     As a result of the disclosures on August 2, 2007, shares of the Company's stock tumbled $3.88 per share, for a loss of over 28 percent, to close on August 3, 2007 at $10.10 per share.

25.    Then, on September 9, 2007, the Company conducted a shocking interview with Globes [online] (Israel business news - www.globes.co.il), stating in part:

Last week BigBand founder and CEO Amir-Bassan-Eskanazi spoke to "Globes" about what went wrong.

***

Which brings us back to the IPO. Perhaps you really did float too soon, and the company wasn't mature enough yet for this?

"The flotation was part of the process of building the company. The networked video transmission field is likely to be even larger than it is today. It was important to our customers that we also continue to establish the company as a public one with $150 million in the bank. New video technology companies are now leading this field, and veterans like Cisco weren't able to hold on to this market. Juniper was the one that made the big break with the advent of Internet transmission over service supplier platforms; IBM was already there when the PC was the big issue, but Intel and Microsoft also entered. We believe that we have the ability to build a company on a scale that will make it the leader of the entire networked video transmission industry.

Are you referring here to the scale of Juniper and Microsoft? You've got big ambitions.

"Not Microsoft or Intel, because this is not a consumer's market, but look at how Juniper built the networking field. I think that our solution is radically different from that of the other companies, in the same fashion as Juniper differed in its approach to the networks market to Cisco and 3Com."

Perhaps the IPO price of $13 per share was too high.

"We set a price that we believed showed where the company stands. We believe that in terms of potential, the company represents the price that we set as a result of the feedback we received during the road show. Without commenting on the price today, or tomorrow, the company is in a growing market, and our market share justifies the share price. This is something that should be assessed over time."

Published by Globes [online], Israel business news - www.globes.co.il - on September 9, 2007

***

26.    As a result of the interview of September 9, 2007, the investment community learned for the first time that, while Defendant Bassan-Eskenazi saw the potential of the Company as a developer and marketer of its software applications,

1  products and services, he left it up to the investment community to guess if Company

2  was, in fact, ready to effectively market its various products. Bassan- Eskenazi would

3  only suggest that it might take a while before shareholders would know if the $13 per

4  share paid during the March 2007 IPO could be justified.

5      27.    Finally, on September 27, 2007, the Company issued a shocking

6  corrective disclosure, in a press release entitled, "BigBand Networks Announces

7  Revised Revenue Outlook for Third Quarter of 2007." The press release stated in part:

8

9          BigBand REDWOOD CITY, Calif., Sept. 27, 2007—BigBand
   Networks, Inc., (NASDAQ: BBND) today revised its revenue outlook
10  for the third quarter ending September 30, 2007. The Company now
   expects to report revenue for the third quarter in the range of $35 to $39
11  million, which is below the Company's previous guidance of $54 to $58
   million.
12
           The lower revenue outlook is due to several coincident factors.
13  BigBand has been deploying switched digital video across an expanding
   number of customers and configurations. Some of these ongoing
14  deployments have required more software customization and integration
   than originally expected. This impacted the Company's ability to
15  recognize switched digital revenue for some deployments in the third
   quarter. The Company also experienced slowdown in Telco-TV revenue,
16  as its major customer worked through some previously purchased
   inventory. Finally, the Company experienced continued softness in its
17  data business. As a result of lower revenue expectations, BigBand
   expects to report an operating loss for the third quarter of fiscal year
18  2007.

19          "While we believe the market for our video solutions continues to
   be strong and are confident in our roadmap for the long term, we are
20  clearly disappointed in our execution this quarter," said Amir Bassan-
   Eskenazi, BigBand's chief executive officer. "We are aggressively
21  addressing these issues and will provide more specifics in our
   announcement of third quarter financial results in early November."
22                                      ***
23
      28.    Finally, the Company revealed the true dimensions of its product
24
   development woes, particularly the fact that efforts to deliver mature, market-ready
25
   products were frustrated by the very customer technologies and hardware that the
26
   BigBand products were purportedly designed to work with. The Company's product
27
   development woes appeared to be at the root of the Company's disastrous financial
28

1  performance, knocking as much as $23 million off the revenue guidance for the third
2  quarter. On this news, shares of BigBand Networks stock fell nearly $2.67 or 29
3  percent, on volume of 6.8 million shares, to close on September 28, 2007 at $6.40 per
4  share.

5          29.    The almost 28% decline in the price of BigBand Networks stock on
6  August 3, 2007, and the subsequent 29% decline on September 28, 2007, at the end of
7  the Class Period, were the direct result of the unraveling of the nature and extent of
8  Defendants' fraud finally being revealed to investors and the market. The timing and
9  magnitude of BigBand Networks' stock price declines negate any inference that the
10 loss suffered by plaintiff and other Class members was caused by changed market
11 conditions, macroeconomic or industry factors or Company-specific facts unrelated to
12 the Defendants' fraudulent conduct.

13         30.    While the almost 28% and subsequent 29% declines in BigBand
14 Networks' stock price occurred as Defendants' fraud was being revealed, the Standard
15 & Poor's 500 securities index was flat. The economic loss, i.e., damages, suffered by
16 plaintiff and other members of the Class were a direct result of Defendants' fraudulent
17 scheme to artificially inflate BigBand Networks' stock price and the subsequent
18 significant decline in the value of BigBand Networks' stock when Defendants' prior
19 misrepresentations and other fraudulent conduct were revealed.

20            **APPLICABILITY OF PRESUMPTION OF RELIANCE**
21              **FRAUD-ON-THE-MARKET DOCTRINE**

22         31.    At all relevant times, the market for BigBand Networks was an efficient
23 market, for the following reasons, among others:

24            (a)    BigBand Networks met the requirements for listing, and was listed
25 and actively traded on the NASDAQ, a highly efficient and automated market;

26            (b)    As a regulated issuer, defendants filed periodic public reports with
27 the SEC; and

28

1          (c)    Defendants regularly communicated with public investors via
2    established market communication mechanisms, including through regular
3    disseminations of press releases on the national circuits of major newswire services
4    and through other wide-ranging public disclosures, such as communications with the
5    financial press and other similar reporting services.

6          32.    As a result of the foregoing, the market for the securities of BigBand
7    Networks promptly digested current information regarding BigBand Networks from
8    all publicly available sources and reflected such information in stock prices of
9    BigBand Networks.   Under these circumstances, all persons who purchased or
10   acquired the securities of BigBand Networks during the Class Period suffered similar
11   injury through their purchase of the aforementioned securities at artificially inflated
12   prices and a presumption of reliance applies.

13                              **NO SAFE HARBOR**

14         33.    The statutory safe harbor provided for forward-looking statements under
15   certain circumstances does not apply to any of the allegedly false statements pleaded
16   in this complaint. Many of the specific statements pleaded herein were not identified
17   as "forward-looking statements" when made.  To the extent there were any forward-
18   looking statements, there were no meaningful cautionary statements identifying
19   important factors that could cause actual results to differ materially from those in the
20   purportedly forward-looking statements. Alternatively, to the extent that the statutory
21   safe harbor does apply to any forward-looking statements pleaded herein, defendants
22   are liable for those false forward-looking statements because at the time each of those
23   forward-looking statements was made, the particular speaker knew that the particular
24   forward-looking statement was false, and/or the forward-looking statement was
25   authorized and/or approved by executive officer(s) of defendants who knew that those
26   statements were false when made.

27

28

## CLASS ACTION ALLEGATIONS

34.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased BigBand Networks publicly traded securities on the open market during the Class Period (the "Class"). Excluded from the Class are defendants.

35.    The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. BigBand Networks had more than 58.7 million shares of stock outstanding, owned by hundreds if not thousands of persons.

36.    There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)    Whether the Exchange Act was violated by defendants;

(b)    Whether defendants omitted and/or misrepresented material facts;

(c)    Whether Defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)    Whether defendants knew or deliberately disregarded that their statements were false and misleading;

(e)    Whether the prices of BigBand Networks' publicly traded securities were artificially inflated; and

(f)    The extent of damage sustained by Class members and the appropriate measure of damages.

37.    Plaintiff's claims are typical of those of the Class because plaintiff and the Class sustained damages from Defendants' wrongful conduct.

38.    Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Plaintiff has no interests which conflict with those of the Class.

39.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5
### Against All Defendants

40.    Plaintiff incorporates ¶¶1-39 by reference.

41.    During the Class Period, Defendants disseminated, approved or deliberately disregarded the false statements specified above, which they knew or should have known were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading.

42.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)    Employed devices, schemes, and artifices to defraud;

(b)    Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading; or

(c)    Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of publicly traded BigBand Networks publicly traded securities during the Class Period.

43.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for BigBand Networks publicly traded securities. Plaintiff and the Class would not have purchased BigBand Networks publicly traded securities at the prices they paid, or at all, if they had been

1  aware that the market prices had been artificially and falsely inflated by Defendants'
2  misleading statements.

3      44.    As a direct and proximate result of these Defendants' wrongful conduct,
4  plaintiff and the other members of the Class suffered damages in connection with their
5  purchases of BigBand Networks publicly traded securities during the Class Period.

6                              **COUNT II**

7              **For Violation of §20(a) of the 1934 Act**
                        **Against All Defendants**
8
9      45.    Plaintiff incorporates ¶¶1-44 by reference.

10     46.    The Individual Defendants acted as controlling persons of BigBand
   Networks within the meaning of §20(a) of the Exchange Act. By reason of their
11
   positions as officers and/or directors of BigBand Networks and their ownership of
12
   BigBand Networks stock, the Individual Defendants had the power and authority to
13
   cause BigBand Networks to engage in the wrongful conduct complained of herein.
14
   BigBand Networks controlled each of the Individual Defendants and all of its
15
   employees. By reason of such conduct, the Individual Defendants and BigBand
16
   Networks are liable pursuant to §20(a) of the Exchange Act.
17
18                           **PRAYER FOR RELIEF**

   WHEREFORE, plaintiff prays for judgment as follows:
19
           (a)    Declaring this action to be a proper class action pursuant to FRCP
20
   23;
21
           (b)    Awarding plaintiff and the members of the Class damages, interest
22
   and costs; and
23
           (c)    Awarding such equitable/injunctive or other relief as the Court
24
   may deem just and proper.
25
26
27
28

1

2                                   **JURY DEMAND**

3         Plaintiff hereby demands a trial by jury on all causes of action so
     triable.
4
     DATED:    October 19, 2007
5
                                            Respectfully submitted,
6

7
                                            SCOTT + SCOTT LLP
8                                           Arthur L. Shingler III
                                            Nicholas J. Licato
9                                           600 B Street, Suite 1500
                                            San Diego, CA 92101
10                                          Telephone: (619) 233-4565
                                            Facsimile: (610) 233-0508
11

12                                          SCOTT + SCOTT LLP
                                            David R. Scott
13                                          108 Norwich Avenue
                                            P. O. Box 192
14                                          Colchester, CT 06415
                                            Telephone: (860) 537-5537
15                                          Facsimile: (860) 537-4432

16

17
                                            *Counsel for Plaintiff*
18

19

20

21

22

23

24

25

26

27

28

## PLAINTIFF CERTIFICATION
## PURSUANT TO FEDERAL SECURITIES LAWS

Donald Smith, ("Plaintiff"), declares, as to the claims asserted under the federal securities laws, that:

1.    Plaintiff has reviewed the Complaint and retains Scott + Scott, LLP and such co-counsel it deems appropriate to associate with to pursue such action on a contingent fee basis.

2.    Plaintiff did not purchase the security that is the subject of this action at the direction of Plaintiff's counsel, or in order to participate in any private action.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff's transaction(s) in the **BIGBAND NETWORKS, INC. (BBND)** security that is the subject of this action during the Class Period is/are as follows:

No of Shares        Buy/Sell        Date        Price Per Share

See Attached Sheet For This Information

5.    During the three years prior to the date of this Certification, Plaintiff has never served, nor sought to serve, as a class representative in a federal securities fraud case.

6.    Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 10th day of October, 2007, at Savannah, GA 31411.

Your Printed Name:    Donald Smith

Signature:

Mailing Address:

REDACTED

Telephone number:

E-mail address:

Donald Smith
BBND Purchases and Sales from 4/19/2007 to 10/2/2007

| Transaction Date | Purchase/ Sale | # of Shares | Price |
|---|---|---|---|
| 04/19/2007 | P | 100 | 19.88 |
| 04/20/2007 | P | 100 | 18.88 |
| 04/24/2007 | P | 100 | 17.88 |
| 05/08/2007 | P | 100 | 18.71 |
| 05/10/2007 | P | 100 | 18.49 |
| 05/11/2007 | P | 100 | 17.49 |
| 05/21/2007 | S | 100 | 18.75 |
| 06/08/2007 | P | 100 | 16.12 |
| 06/22/2007 | P | 100 | 15.84 |
| 06/29/2007 | P | 100 | 13.73 |
| 09/12/2007 | S | 500 | 9.2 |
| 10/02/2007 | S | 300 | 6.15 |